AP-77,054
COURT OF CRIMINAL APPEALS
AUSTIN, TEXAS
Transmitted 3/16/2015 9:11:51 PM
Accepted 3/17/2015 7:24:23 AM
ABEL ACOSTA
CLERK

NO. AP-77,054

# IN THE COURT OF CRIMINAL APPEALS OF TEXAS

RODNEY REED,
*Appellant,*
v.
THE STATE OF TEXAS,
*Appellee.*

*Arising from:*

THE DISTRICT COURT
FOR THE 21st JUDICIAL DISTRICT,
BASTROP COUNTY, TEXAS

## REPLY BRIEF OF APPELLANT RODNEY REED

Bryce Benjet
State Bar No. 24006829
THE INNOCENCE PROJECT
40 Worth Street
New York, New York 10013
(212) 364-5340
(212) 364-5341 (fax)
Email: benjet@innocenceprojet.org

Andrew F. MacRae
State Bar No. 00784510
LEVATINO/PACE LLP
1101 S. Capital of Texas Highway
Building K, Suite 125
Austin, Texas 78746
(512) 637-8565
(512) 637-1583 (fax)
Email: amacrae@levatinopace.com

## IDENTITY OF PARTIES AND COUNSEL

District Attorney: BRYAN GOERTZ
Criminal District Attorney
804 Pecan Street
Bastrop, Texas 78602


Counsel for the State: MATTHEW OTTOWAY
Assistant Attorney General
Bastrop County, Texas
P.O. Box 12548
Capitol Station
Austin, Texas 78711

Appellant: RODNEY REED

Counsel for Appellant: BRYCE BENJET
Attorney at Law
THE INNOCENCE PROJECT
40 Worth Street, Suite 701
New York, New York 10013

ANDREW F. MACRAE
LEVATINO/PACE LLP
1101 S. Capital of Texas Highway
Building K, Suite 125
Austin, Texas 78746

**TABLE OF CONTENTS**

**Page**

INDEX OF AUTHORITIES..................................................................................v

I.      INTRODUCTION ...............................................................................1

II.     ARGUMENT .....................................................................................2

        A.      The State's "Specificity" Argument Is Contradicted By The
                Record.....................................................................................2

                1.      The Evidence.............................................................2

                2.      The State's "Specificity" Argument Is Unsupported..................3

        B.      The District Court Wrongly Concluded That Reed Failed To
                Prove That Exculpatory Test Results Likely Would Have
                Resulted In Acquittal................................................................6

                1.      The State Applies An Incorrect Standard To Evaluate
                        The Weight Of Exculpatory Results. ...........................6

                2.      The State Mischaracterizes Reed's Arguments That The
                        District Court Incorrectly Found That He Did Not Show
                        He Would Not Have Been Convicted With Exculpatory
                        Test Results. ................................................................11

                3.      The State Does Not Justify The Failure To Apply The
                        Proper Exculpatory Result Presumption.................................15

        C.      The Court Should Overrule The District Court's Adoption Of
                The State's Unreasonable Delay Findings. ........................................18

                1.      The Court Should Reject The State's Efforts To Change
                        The Standard Of Review...........................................18

                2.      Reed Proved That His Motion Was Not Made For The
                        Purpose Of Unreasonably Delaying His Execution..................19

        D.      Reed Satisfied The Elements Of Chain Of Custody And
                Biological Evidence. .......................................................21

iii

1.      The State Conflates Chain Of Custody With Evidence
        Contamination. ...................................................................22

2.      Reed Established Through Unrebutted Expert Testimony
        That The Evidence He Seeks To Test Contains
        Biological Evidence. ...........................................................27

CONCLUSION AND PRAYER ...........................................................29

iv

# INDEX OF AUTHORITIES

**Cases**                                                                               **Page**

*Boeck v. State*,
No. 04-04-00024-CR, 2004 WL 2997788 (Tex. App.—San Antonio,
Dec. 29, 2004) ................................................................................................26

*Brady v. Maryland*, 373 U.S. 83 (1963) ........................................................7, 10

*Brooks v. Northglen Association,*
141 S.W.3d 158 (Tex. 2004) ............................................................................4

*Brown v. State*,
No. AP-75469, 2006 WL 2069445 (Tex. Crim. App. 2006) ........................20

*Commonwealth v. Conway*,
14 A.3d 101 (Pa. 2011) ....................................................................................9

*Dinkins v. State*,
84 S.W.3d 639 (Tex. Crim. App. 2002) ........................................................5, 6

*District Attorney's Office for Third Judicial District v. Osborne*,
557 U.S. 52 (2009) ............................................................................................8

*Ex parte Miles*,
359 S.W.3d 647 (Tex. Crim. App. 2012) ..........................7, 8, 9, 10, 11, 17

*Ex parte Reed*,
271 S.W.3d 698 (Tex. Crim. App. 2008) ......................................................10

*In re Gutierrez*,
337 S.W.3d 883 (Tex. Crim. App. 2011) ......................................................13

*Holberg v. State*,
425 S.W.3d 282 (Tex. Crim. App. 2014) ............................................7, 12, 13

*House v. Bell*,
547 U.S. 518 (2006) ..........................................................................................8

*In re K.J.T.M.*,
No. 06-09-00104-CV, 2010 WL 1664027 (Tex. App.—Texarkana
Apr. 27, 2010, no pet.) ...................................................................................21

*Kutzner v. State*,
75 S.W.3d 427 (Tex. Crim. App. 2002) ...............................................13, 14, 20

*Medellin v. State*,
617 S.W.2d 229 (Tex. Crim. App. [Panel Op.] 1981)...................................26

*Pate v. State*,
No. 10-09-00360-CR, 2011 WL 652920 (Tex. App.—Waco Feb. 23,
2011, pet. ref'd) ......................................................................................26

*Pena v. State*,
353 S.W.3d 797 (Tex. Crim. App. 2011) .......................................................7

*Powers v. State*,
343 S.W.3d 36 (Tenn. 2011) ........................................................................9

*Riggins v. State*,
No. 11-03-00307-CR, 2004 WL 743742 (Tex. App.—Eastland, April
8, 2004) ...................................................................................................26

*Routier v. State*,
273 S.W.3d 241 (Tex. Crim. App. 2008) ...............................7, 11, 14, 15, 17

*Skinner v. State*,
122 S.W.3d 808 (Tex. Crim. App. 2003) ................................................19 21

*State v. Butler*,
21 A.3d 583 (Conn. App. Ct. 2011) ..............................................................9

*State v. DeMarco*,
904 A.2d 797 (N.J. Super. Ct. App. Div. 2006) ............................................9

*State v. Noling*,
992 N.E.2d 1095 (Ohio 2013) .......................................................................9

*State v. Patrick,*
86 S.W.3d 592 (Tex. Crim. App. 2002) .................................................19, 20

*State v. Swearingen*,
424 S.W.3d 32 (Tex. Crim. App. 2014) ...........................................10, 14, 29

*Stoker v. State*,
788 S.W.2d 1 (Tex. Crim. App. 1989) .........................................................26

vi

*Thacker v. State*,
177 S.W.3d 926 (Tex. Crim. App. 2005) ......................................................20

*Wilson v. State*,
No. AP-76835, 2012 WL 3206219 (Tex. Crim. App. Aug. 7, 2012) .....19, 20

**STATUTES**

Miss. Code Ann. § 99-39-11(10) (West Supp. 2014)..............................................10

N.Y. Crim. Proc. Law § 440.30(1-a)(c)...................................................................10

Tex. Code Crim. Proc. Ann. art. 64.01 .........................................................12, 13, 21

Tex. Code Crim. Proc. Ann. Art. 64.03(a)........................................................*passim*

**OTHER AUTHORITIES**

Act of June 17, 2011, 82d Leg., R.S., H.B. 1573, §§ 5-6, arts. 64.01, 64.035,
2011 Tex. Sess. Law Serv. 278 (West) ..........................................................7

*Exonerated: Cases by the numbers*, CNN,
http://www.cnn.com/2013/12/04/justice/prisoner-exonerations-facts-
innocence-project/ (last visited March 13, 2015).........................................8

House Criminal Jurisprudence Committee, Bill Analysis, Tex. S.B. 3 at 6,
77th Leg., R.S. (2001) ..................................................................................25

# I.

## INTRODUCTION

Almost two weeks into this appeal, and shortly after Reed filed his habeas application raising new evidence of innocence, the State moved to expedite the appeal to preserve Reed's March 5th execution. In its opposition brief, the State renewed its request. Later that day, the Court entered its stay order to permit consideration of Reed's innocence claims.

DNA testing has exonerated more than 325 wrongfully convicted persons. If Reed's prosecution occurred today, his motion would be unnecessary because the murder weapon and other items he seeks to test would be subject to *mandatory* testing. The State's zeal to execute Reed to moot DNA testing, and avoid consideration of compelling new evidence of Reed's innocence, speaks volumes.

\* \* \*

Reed's appeal presents two primary questions: (i) whether the District Court misapplied the "exculpatory results" test in Article 64.03(a)(2)(A); and (ii) whether the District Court wrongly concluded that Reed filed his motion to unreasonably delay his execution under Article 64.03(a)(2)(B). As the record flatly contradicts the District Court's Findings and Conclusions and conclusively establishes Reed's right to DNA testing, the District Court's ruling should be reversed. Testing should be ordered, and Reed renews his offer to pay for it.

## II.

## ARGUMENT

## A.  The State's "Specificity" Argument Is Contradicted By The Record.

The State spends a considerable time complaining that Reed's motion lacks specificity.  State Br. 19-20.[1]  These complaints are contrived; indeed, the State's brief demonstrates a detailed understanding of Reed's request, an understanding that is supported by the record of the full-day hearing at which each item was painstakingly discussed by Reed's two experts.[2]

### 1.  The Evidence.

Reed's testing request focused on items handled by Stites' murderer, and they therefore contain DNA that can exonerate Reed:

- Pieces of the belt used to strangle Stites.[3]

- The name tag in the crook of Stites' knee.[4]

- Other items of Stites' clothing and apparel, including her pants, shoes, socks, underwear, bra, work shirt, tee shirt and earring.[5]

---

[1]  Reed opening brief and the State's opposition brief are cited as "Reed Br." and "State Br." respectively.

[2]  The State's opposition to Reed's motion likewise reflected an extensive understanding of the scope of evidence Reed sought to test.  *See* C.R. 161-229.

[3]  Reed identified both pieces of the belt in his motion (at 3, 22-25), the exhibit thereto (at 1, 3-5), in Appendix A to such exhibit (at 1-2), and at the Hearing (2 R.R. 24, 39, 43).

[4]  Reed identified the name tag in his motion (at 4, 20, 22-24, 26), the exhibit thereto (at 2, 5), in Appendix A to such exhibit (at 3), and at the Hearing (2 R.R. 44:12-16).

[5]  Reed requested testing of all "[r]elevant areas of Ms. Stites' clothing" in his motion, which he identified as "the shirt, pants, bra, panties" and other "areas of Stites' clothing that were grabbed by the perpetrator." (Motion at 3, 20).  He further identified such clothing and

2

Reed also seeks to test:

- Biological samples, tape lifts and hairs recovered from Stites' body (*see* Motion at 3).

- Fingerprints recovered by investigators (*id.* at 4).

- A condom and certain other evidence items found in or near Fennell's truck, including an ink pen and check carbons that both contain fingerprints, a lighter, pack of Big Red gum, a box cutter, the planner (and the unidentified hair found in it), a knife in a scabbard, rope, a plastic bag, and a napkin, receipts and other various paper items. *See* Motion at 4 *and* Appendix at 1-2 (C.R. 77, 115-16); 2 R.R. 44-45 (planner) and 50 (hair).

- Beer cans collected near Stites' body, including swabs and extracts of the same. 2 R.R. 46-47, 55.

Thus, the State's attempts to portray Reed's request as a moving target is a calculated strategy to "muddy the waters" by injecting confusion where there is none.

## 2. The State's "Specificity" Argument Is Unsupported.

The State's argument that the Court should affirm the District Court's denial of Reed's Chapter 64 motion in its entirety because the State is purportedly confused about the precise location of testing Reed seeks to conduct on some items should be rejected for at least four reasons.

---

apparel items in the Appendix to his motion, including the pants, bra, underwear, and shirt pieces (at 3), the earring, and white tee shirt (at 2). At the Hearing, Reed's experts identified the clothing items to be tested as including the pants (2 R.R. 29-30), belt (*id.* at 39, 43), underwear (*id.* at 33), socks (*id.* at 34-35), shoes (*id.* at 35-37 (left shoe) *and* 39-40 (right shoe)), bra (*id.* at 37), tee shirt (*id.* at 38), earring (*id.* at 40), and HEB work shirt (*id.* at 41).

*First*, the *State's* alleged confusion is irrelevant—the District Court **never ruled** that Reed's motion lacked specificity.  Indeed, at the Hearing, the Court overruled the State's specificity objections (2 R.R. 31-32) and repeatedly overruled the State's objections to the testimony of Reed's experts on the grounds that their testimony concerned items not specified in the motion (2 R.R. 36; 3 R.R. 110, 112).

By complaining about findings that were not made below, the State is effectively asking this Court to make supplemental findings on appeal.  However, as the State never filed a cross appeal, the issue of "specificity" is not properly before the Court.  *See Brooks v. Northglen Ass'n*, 141 S.W.3d 158, 171 (Tex. 2004) ("[A] party who seeks to alter the trial court's judgment or other appealable order must file a notice of appeal." (alteration in original) (*quoting* Tex. R. App. P. 25.1(c)).

*Second*, there are no grounds to supplement the State-drafted Findings and Conclusions with additional "lack of specificity" findings.  The State concedes that Reed listed the items he sought to test with his letter requesting testing and in his motion.  *See* State Br. 20.  The State's response identified each item it believed Reed wanted to test (C.R. 172-73) and explained why the State opposed testing it.  Further, two experts identified what items Reed sought to test, the reasons why he

4

sought to test each and where DNA evidence was located on each item.  Reed Br. 27-35.[6]

*Third*, the State is effectively challenging putative omissions from a document it drafted, which the District Court adopted *verbatim* (including typographical errors) and *ex parte*.  If the State genuinely believed that the District Court intended to deny Reed's motion for lack of specificity (and the District Court's comments at the Hearing suggest the opposite), surely the State would have proposed specificity findings.

*Dinkins v. State*, 84 S.W.3d 639, 642 (Tex. Crim. App. 2002), does not hold that a court should deny testing if there is confusion over what is to be tested. State Br. 25-26.  The Court noted possible confusion that might arise from inconsistencies in descriptions of the evidence identified in the motion and an expert affidavit, but such inconsistencies were not the basis of the ruling.  Rather, the Court affirmed denial of the motion based upon the movant's failure to adduce facts establishing biological material, not because of the noted inconsistencies.

---

[6]    Indeed, at the Hearing, the District Court more than once expressed frustration at the painstakingly detailed testimony that Reed presented with respect to each item he sought to test.  2 R.R. 36-37 (District Court:  "Is there any way we can package all these as opposed to going through them all individually?"); 3 R.R. 111 (District Court:  "Let me ask you this question.  If you look at every one of those exhibits up there, is there anything that you wouldn't test? . . . Speed it up.  You're going to go through — . . . every one at a time.  If you can do that altogether, we can get this done.").

*Dinkins*, 84 S.W.3d at 642-43.  Here, the District Court made no findings of confusion regarding the evidence that Reed wanted to test.

*Fourth*, the State's claimed confusion applies only to a select few items that were primarily in the possession of the Attorney General's Office.  The vast majority of the items to be tested were discussed in Reed's informal request, his motion, and at the Hearing.

**B.    The District Court Wrongly Concluded That Reed Failed To Prove That Exculpatory Test Results Likely Would Have Resulted In Acquittal.**

Reed demonstrated that the District Court committed multiple material errors, including failing to apply the proper exculpatory results presumption.  The State largely sidesteps Reed's arguments and, instead, distorts the record and offers contrived arguments of forfeiture.  These unsupported and inapplicable arguments ignore that the State's case against Reed has been gutted by the unanimous agreement of Reed's experts and the State's experts at trial.  The State's reach for a more narrow standard and its refusal to address the substance of the evidence highlight the weakness of its position.

**1.    The State Applies An Incorrect Standard To Evaluate The Weight Of Exculpatory Results.**

The State's argument that exculpatory DNA results would not prove innocence offers a strained and impermissibly narrow statutory construction. Article 64.03(a)(2)(A) states that a defendant must prove by a preponderance of the

6

evidence that he "would not have been convicted if exculpatory results had been obtained through DNA testing." The Legislature did not define the term "exculpatory results," and the State seizes upon the *Swearingen* case to claim the term should mean *only* that the defendant has been excluded as the donor of the biological material. State Br. 32. This construction is inconsistent with this Court's jurisprudence, which permits consideration of the presence of third-party DNA. *See Routier v. State*, 273 S.W.3d 241, 259 (Tex. Crim. App. 2008).

### (a) "Exculpatory Results" cannot be limited to results that only exclude the defendant.

The Court has rejected the notion that "exculpatory results" are limited to the DNA exclusion of the defendant. Since *Routier*, Chapter 64 was amended to expand access to DNA testing by expanding the definition of "biological material" and by requiring that DNA profiles be compared to DNA databases. *See* Act of June 17, 2011, 82d Leg., R.S., H.B. 1573, §§ 5-6, arts. 64.01, 64.035, 2011 Tex. Sess. Law Serv. 278 (West) (2011 amendment); *Holberg v. State*, 425 S.W.3d 282, 286 n.24 (Tex. Crim. App. 2014).

The term "exculpatory" is well-defined in the context of *Brady v. Maryland*, 373 U.S. 83 (1963), and is generally understood as anything favorable to the defendant:

7

> Exculpatory evidence is that which may justify, excuse, or clear the defendant from alleged guilt, and impeachment evidence is that which disputes, disparages, denies, or contradicts other evidence.

*Pena v. State*, 353 S.W.3d 797, 811-12 (Tex. Crim. App. 2011). A third-person suspect is a classic example of exculpatory evidence. *See Ex parte Miles*, 359 S.W.3d 647, 666 (Tex. Crim. App. 2012). In *Miles*, this Court explained that police reports identifying known suspects by name were "exculpatory" under *Brady* because their disclosure "could have led to further investigation of other suspects and theories." *Id.* at 666-67.

The State disregards this well-established precedent and urges a different standard for DNA testing—one of the few objective, scientific tools that can determine guilt or innocence. The State and District Court applied a definition of "exculpatory" that includes only *slightly* favorable DNA results (an exclusion), but which would prohibit consideration of the unique ability of DNA testing to identify others present at the crime scene. *See Dist. Attorney's Office for Third Judicial Dist. v. Osborne*, 557 U.S. 52, 55 (2009) ("DNA testing has an unparalleled ability both to exonerate the wrongly convicted and to identify the guilty."). Indeed, an alternative suspect is identified in nearly 50% of all DNA exonerations.[7] And where hypothetical "exculpatory results" must prove probable innocence, limiting

---

[7] *See Exonerated: Cases by the numbers*, CNN, http://www.cnn.com/2013/12/04/justice/prisoner-exonerations-facts-innocence-project/ (last visited Mar. 13, 2015).

the result to an exclusion would eliminate a key class of evidence that the U.S. Supreme Court has recognized as vital to such a showing. *See House v. Bell*, 547 U.S. 518, 548 (2006) (noting that evidence undermining State's case against House would not have been enough to prove innocence without other evidence pointing to a different suspect); *see also Ex parte Miles*, 359 S.W.3d at 666-67 (exculpatory evidence includes identity of alternative suspect and requires consideration of what investigation would reveal).

### (b) Numerous jurisdictions consider all realistically possible exculpatory DNA results.

Other jurisdictions do not place a hard and fast rule limiting how favorable the exculpatory results can be when determining access to post-conviction DNA testing. Tennessee courts have construed a very similar statute to allow for consideration of all "realistically possible" exculpatory results:

> "[T]he trial court should postulate whatever realistically possible test results would be most favorable to [the] defendant in determining whether he has established" the statutory reasonable probability requirement.

*Powers v. State*, 343 S.W.3d 36, 55 (Tenn. 2011) (second alteration in original) (quoting *State v. Peterson,* 836 A.2d 821, 827 (N.J. Super. Ct. App. Div. 2003) (adopting New Jersey standard)). And just as this Court has done in the *Brady* context, other jurisdictions consider both the DNA profile obtained and the realistic possibilities that flow from the detection of a DNA profile, including the identification of a specific individual or DNA database match. *See, e.g., Powers*,

9

343 S.W.3d at 58; *State v. Noling*, 992 N.E.2d 1095, 1105 (Ohio 2013); *State v.*

*Butler*, 21 A.3d 583, 588 (Conn. App. Ct. 2011); *Commonwealth v. Conway*, 14

A.3d 101, 114 (Pa. 2011); *State v. DeMarco*, 904 A.2d 797 (N.J. Super. Ct. App.

Div. 2006); *see also* Miss. Code Ann. § 99-39-11(10) (West Supp. 2014); N.Y.

Crim. Proc. Law § 440.30(1-a)(c) (McKinney Supp. 2015) (same).[8]

Although this Court declined to consider a match to a DNA database as

"required" in *Swearingen*, the Court's opinion did not conclusively prohibit

consideration of the possibility. In that case, the Court clearly believed that there

was no realistic possibility of a DNA match given the "mountain of inculpatory

evidence" against Swearingen. *State v. Swearingen*, 424 S.W.3d 32, 38 (Tex.

Crim. App. 2014). Here, the Court has already recognized a "healthy suspicion"

that Fennell was involved in Stites' death and thus, the possibility that Reed is

innocent. *See Ex parte Reed*, 271 S.W.3d 698, 747 (Tex. Crim. App. 2008).

As numerous jurisdictions recognize, the scope of the "exculpatory results"

considered in granting testing must reflect the technology available. All

realistically possible DNA results should be considered, including:

- finding no DNA;

- detecting an unknown DNA profile on single or multiple samples; and

---

[8] Reed has found no decision that supports the State's position that a DNA database match should be prohibited despite a statutory scheme that presumes favorable results and requires courts to submit results for a CODIS search.

10

- identifying the source of foreign DNA profiles detected on single or multiple samples.

As this Court recognized in the *Brady* context in *Ex parte Miles*, all realistic consequences flowing from the discovery of a DNA profile (such as a database hit to a known offender) should be considered. *See Miles*, 359 S.W.3d at 667. Adopting the contrary definition suggested by the State would place blinders on trial judges by preventing consideration of the true benefits of DNA testing and greatly increase the risk of wrongful imprisonment and execution.

**2. The State Mischaracterizes Reed's Arguments That The District Court Incorrectly Found That He Did Not Show He Would Not Have Been Convicted With Exculpatory Test Results.[9]**

Reed demonstrated that the Findings and Conclusions regarding whether DNA test results would have changed the outcome at trial were not supported by the record. In particular, Reed showed that the District Court's conclusion regarding the apparent "strength" of the State's case against him, and the supporting facts on which such conclusion was premised, were contradicted by the record facts and based on discredited and recanted science. Reed Br. 46-52.

The State's brief is largely non-responsive. The State does not attempt to bolster the "strength" of its case, nor does it challenge Reed's point-by-point

---

[9] The State's suggestion that Reed improperly submitted "two appendix volumes" of "post-trial evidence" is unsupported and distorts the record. State Br. 27. Reed's Appendix consists of pages from his trial and subsequent proceedings cited in his brief, including Reed's new state habeas action. The contents of the Appendix are all public filings, included in the appendix for the convenience of the Court as permitted, and are matters of which this Court may duly take judicial notice. *See Routier*, 273 S.W.3d at 244 n.2.

11

dismantling of that conclusion or the subsidiary findings on which it rested. Instead, the State offers a red-herring-argument—that Reed's "first and primary contention is that the trial court should have considered post-trial evidence in making its Article 64.03(a)(2)(A) finding." State Br. 27. The State's claim that the "trial court properly *eschewed* Appellant's request to consider post-trial evidence and such evidence is not properly before this Court" implies that the District Court considered, and rejected, Reed's post-conviction expert affidavits. State Br. 29 (emphasis added). That is wrong—***no*** such discussion occurred at the Hearing, nor do the State-drafted Findings and Conclusions contain ***any*** such findings.

The State's reliance on *dicta* in *Holberg* is misplaced. In *Holberg*, the Court was not asked to decide whether post-conviction expert analyses of crime scene evidence could be considered in the context of evaluating a movant's case under Article 64.03(a)(2)(A). To the contrary, *Holberg* involved whether subsequent expert analyses could be considered in a different context—in evaluating whether biological material was present under Article 64.01. The Court considered the expert reports in that context, but declined to decide whether they were sufficient to meet Article 64.01's requirements because the movant failed to establish a likelihood that exculpatory results would have changed the verdict at trial. 425 S.W.3d at 286.

12

Additionally, *Holberg* is distinguishable because the State presented overwhelming evidence that Holberg had committed the murder. The issue was whether DNA testing might demonstrate that someone else robbed the victim, undermining the statutory basis for her capital sentence. Here, the State presented *no* evidence that placed Reed at the abandoned truck or where Stites' body was found.

Numerous decisions demonstrate that post-conviction expert analysis is properly considered in a Chapter 64 motion. For example, Article 64.01 places no restrictions on the movant's evidence demonstrating that identity was an issue at trial, as this Court expressly acknowledged in *In re Gutierrez*, 337 S.W.3d 883, 893 (Tex. Crim. App. 2011). Section 64.03(a)(2)(A) likewise contains no express limitation on a movant's ability to introduce evidence demonstrating how exculpatory DNA results will be persuasive to the jury. Had the Legislature intended such a limitation, it would have said so.

There appears in this Court's opinions to be justified reluctance to permit sweeping consideration of post-conviction evidence not directly relevant to the elements of a DNA motion. *See Holberg*, 425 S.W.3d 282*; Kutzner v. State*, 75 S.W.3d 427 (Tex. Crim. App. 2002). However, even in these cases, the Court considered expert and other evidence developed post-conviction. *See Holberg*,

13

425 S.W.3d at 285-86.[10] In *Kutzner*, the court considered a report describing the police investigation of an item that may have been stolen from the deceased. Indeed, *Kutzner* "assum[ed in the alternative] that Article 64.03(a)(2)(A) *does permit* a consideration of this 'new' post-trial information." *Kutzner*, 75 S.W.3d at 439 (assuming in alternative that new post-conviction evidence properly considered); *see also Swearingen*, 424 S.W.3d at 37-38 (considering post-conviction affidavit from DNA expert on issue of whether biological material exists on subject evidence); *Routier*, 273 S.W.3d at 250-51 (considering post-conviction affidavit from DNA expert on ability of current DNA testing techniques to provide more sensitive test results on previously tested evidence). Instead of the absolute prohibition asserted by the State, this Court's jurisprudence reflects a balanced approach in which post-conviction evidence relevant to Chapter 64 elements can be considered, including evidence that contradicts the "strength" of the State's case at trial, as considered under Article 64.03(a)(2)(A). *See also Routier*, 273 S.W.3d at 244 n.2 (allowing court to take judicial notice of record in related proceedings).

---

[10] In *Holberg*, the Court declined to resolve the issue of whether the movant's declarations were adequate to satisfy the proof of biological material requirement because the movant failed to meet her burden to show that it was likely that exculpatory DNA test results would have resulted in a not guilty verdict. 425 S.W.3d at 286.

14

### 3. The State Does Not Justify The Failure To Apply The Proper Exculpatory Result Presumption.

The District Court misapplied the statute by, among other things, failing to consider the effect of test results showing the absence of Reed's DNA and the presence of third-party DNA on the belt and other evidence handled by the killer, as permitted by *Routier* and *Fain* where evidence of guilt is less than overwhelming. Reed Br. 52-59. The State ignores this case law and argues, based on its improper construction of the "exculpatory results" element, that the only permissible exculpatory results are those which would exclude the movant from that item of evidence. State Br. 32-34. This argument is misplaced; the District Court adopted only cursory of findings on this issue in Paragraph 24c, which states as follows:

> Further, the court finds that none of the evidence Movant seeks to test was so integral to the State's case that the jury would have acquitted despite knowing the movant's DNA was not on the item. Many of the items were in a truck shared with the victim's fiancé and evidence at trial demonstrated that other people had ridden in the truck. Thus, the jury would not be surprised to know that foreign DNA was found on the items originating from the truck. Further, many of the items of evidence of been handled by ungloved individuals, which further undermines the value of such "exculpatory" results before a jury. Ultimately, at best, exculpatory results from the items Movant seeks test would muddy the waters, not prove by a preponderance that he would have been acquitted.

These findings failed to consider the focus of Reed's proof at the Hearing—that DNA from the person who committed the crime would be left on areas of evidence

15

that were handled in the course of the commission of the crime.  As discussed

generally by John Paolucci, an experienced crime scene investigator whose job it

was to select items from the crime scenes for DNA testing:

> So what I'm -- what I'm looking for is areas that were touched by the perpetrator.  So now, if a perp—a perpetrator is dragging a victim so that the dependent portion of the victim is the back, that would mean that they're holding them likely by the feet or some area below the back and that would mean that they're pulling on an area depositing skin cells on possibly the cuffs of the pants, the socks, the sneaker.  And I also noticed in the trunk there was an untied shoe.  Now, if a perpetrator is to untie that shoe, they're going to be handling that -- that evidence and depositing skin cells on it.  Maybe pulling the shoe off of the foot.
>
> . . . .
>
> Also, the belt.  Because the belt had similar -- had a similar pattern to markings on the victim's throat.  So that would mean that there was some sort of pressure applied to the belt which would mean a significant deposit of epithelial cells on that belt by the perpetrator.

2 R.R. 24.  The majority of the Hearing involved a detailed item-by-item

description of each piece of evidence, with testimony from both Paolucci and DNA

scientist Deanna Lankford regarding how that evidence would be tested, and the

relevance of the realistically possible results of finding the same type of evidence

(redundant DNA profiles across the crime scene) that this Court found persuasive

in *Routier*.  Reed Br. 27-35.

The identification of a specific person's DNA profile could be dispositive.

For example, the State contended that Fennell was ruled out as a suspect because

he could not have committed the murder and returned home within the State's

16

timeframe. DNA test results that identify a known associate of Fennell's on items handled in the dragging of the body would contradict the State's only reason for dropping Fennell as a suspect and would provide a coherent explanation for how Fennell committed the murder. *See* 2 R.R. 26 (explaining that DNA testing important to confirm or contradict account of alternative suspect).

The State's primary defense of the District Court's findings relies on its flawed and improperly narrow definition of "exculpatory results." Hoping to make lemonade out of lemons, the State contends that the jury already knew that there was no physical evidence linking Reed to the crime scenes, and, therefore, a DNA exclusion would not prove innocence. State Br. 36-42. This response highlights the fundamental weakness of the State's case at trial—that the physical evidence was equally consistent with a consensual encounter Reed. Moreover, it ignores the full potential of DNA testing on evidence that is actually linked to the murder itself. As in *Routier*, finding the same DNA profile on multiple items that were known to have been handled in the course of the murder will create direct evidence that the source of that DNA is the murderer and not Reed. And if that person is actually identified to be Fennell or one of his associates, additional investigation may further prove Reed's innocence. *See Miles*, 359 S.W.3d at 667 (exculpatory evidence includes consideration of results of reasonable investigation stemming from disclosure).

17

**C. The Court Should Overrule The District Court's Adoption Of The State's Unreasonable Delay Findings.**

**1. The Court Should Reject The State's Efforts To Change The Standard Of Review.**

Neither the facts nor the law supports a finding that Reed intended to cause unreasonable delay by seeking DNA testing under the applicable *de novo* standard of review. *See* Reed Br. 62, 65-86. Thus, contrary to controlling authority, the State asks the Court to give "almost total deference" to the findings adopted by the District Court because the "delay" element involves a credibility issue. State Br. 44-45. The State's reasoning is flawed. Reed supported his motion with an affidavit as required by Article 64.01(2)(a-1). C.R. 317-318. The State claims, without record citation, that it "challenged Appellant's credibility" at the Hearing by contesting certain unspecified statements contained in Reed's affidavit. State Br. 44. The State then argues that, because it allegedly challenged Reed's credibility, the almost-total-deference standard of review applies to the entirety of the District Court's conclusion of unreasonable delay. *Id.* This is not the law; moreover, the State's argument is factually baseless. Although the State introduced exhibits at the Hearing (evidence photographs and post-conviction opinions), none "challenged [Reed's] credibility." Indeed, even at closing argument, the State never argued that Reed's credibility was at issue; instead, it claimed that Reed's counsel could have requested DNA testing sooner. 2 R.R.

18

219-222. And, as the cases cited by the State make clear, this Court has applied *de novo* review to similar application-of-law-to-fact issues. *See State v. Skinner*, 122 S.W.3d 808, 812 (Tex. Crim. App. 2003).

## 2. Reed Proved That His Motion Was Not Made For The Purpose Of Unreasonably Delaying His Execution.

Chapter 64 does not require a movant to demonstrate that he could not have sought DNA testing earlier than he did; rather, he must show only that his request was not made to *unreasonably* delay his execution. *See* Art. 64.03(a)(2)(B); *Wilson v. State*, No. AP-76835, 2012 WL 3206219, at *4 (Tex. Crim. App. Aug. 7, 2012) (not designated for publication) ("Although a defendant seeking DNA testing no longer need show why he did not raise a claim earlier, he still must show that his claim has not been made to unreasonably delay the execution of his sentence."). In *Skinner*, this Court overruled a district court's finding of unreasonable delay when a movant filed a Chapter 64 motion prior to a set execution date and during a pending habeas appeal without regard to whether the movant could have requested testing sooner. 122 S.W.3d at 811.[11]

---

[11] Judge Hervey's concurrence in *State v. Patrick* does not, as the State argues, suggest a contrary view. 86 S.W.3d 592, 594 (Tex. Crim. App. 2002). *Patrick* had nothing to do with unreasonable delay. In that case, the trial court ruled that the defendant failed to satisfy the elements of Chapter 64, but it nonetheless entered an order permitting DNA testing at the defendant's expense. The State appealed, but the appeal was dismissed for lack of jurisdiction. 86 S.W. 3d at 594 ("The State's appeal is dismissed."). The State also sought a writ of mandamus on the grounds that the trial court lacked jurisdiction to order DNA testing if the defendant failed to demonstrate satisfaction of the statutory elements, which this Court granted. Judge Hervey's concurrence addressed an issue raised in the dissenting

The handful of cases in which this Court has upheld a finding of unreasonable delay are instructive. Each involved extreme delay and a last-minute motion filed in the face of an imminent execution, and bear no resemblance to Reed's case. *See Wilson*, 2012 WL 3206219, at *4 (second Chapter 64 motion filed less than a week before scheduled execution; defendant also failed to show DNA evidence would be exculpatory); *Brown v. State*, No. AP-75469, 2006 WL 2069445, at *1 (Tex. Crim. App. 2006) (per curiam) (not designated for publication) (motion filed 20 days before scheduled execution); *Thacker v. State*, 177 S.W.3d 926, 927 (Tex. Crim. App. 2005) (motion filed 27 days before scheduled execution); *Kutzner*, 75 S.W.3d at 441-42 (request made nine days before scheduled execution; finding overwhelming evidence of guilt).

Reed's request for DNA testing was not an eleventh-hour effort to stave off an imminent execution, and this Court's recent stay eliminates the risk that DNA testing will now actually delay an execution. The undisputed facts show that Reed's DNA request was a continuation of his seventeen-year quest to prove his innocence. Reed sought DNA testing at trial and in early post-conviction efforts

opinion and it simply noted that last-minute requests for DNA testing without regard to the timing of the request and proximity to execution are not consistent with the statute's unreasonable delay element. *Id*. at 598. Judge Hervey's concurrence did not purport to address any issues presented in the State's appeal or mandamus motion, to decide whether any particular conduct of the movant in that case demonstrated an intent to cause unreasonable delay, or to establish standards for evaluating whether a movant has satisfied the statutory preponderance burden imposed by Article 64.03(a)(2)(A).

20

and renewed his request by seeking the State's agreement to conduct DNA testing *months before the State even sought an execution date* (and more than a year before his last scheduled execution date).  The State's chosen execution date was scheduled at a time sufficiently far out (six months) to permit the DNA testing to which the State agreed, and the State's own conduct caused delays in these proceedings.  These compelling facts demonstrate that Reed did not seek DNA testing to unreasonably delay his execution and that the District Court's Findings and Conclusions to the contrary should be reversed.[12]

## D.  Reed Satisfied The Elements Of Chain Of Custody And Biological Evidence.

The District Court made no findings or conclusions as to whether the items Reed seeks to test were subject to a sufficient chain of custody (Art. 64.03(a)(1)(A)(2)), or whether they contained biological evidence that may be suitable for testing (Art. 64.01(a)(1)).  The District Court's silence on these elements demonstrates that Reed met his burden on both.  Reed Br. 86, citing *Skinner*, 122 S.W.3d at 809 n.1.  Such findings are particularly justified by the extensive unrebutted expert testimony on both elements and because the State concedes the issue by failing to respond.  *See In re K.J.T.M.*, No. 06-09-00 104-CV, 2010 WL 1664027, at *2 n.4. (Tex. App. – Texarkana, Apr. 27, 2010, no. pet.)

---

[12] Reed has found no case, nor does the State cite one, in which this Court has found unreasonable delay when a movant both satisfied the "exculpatory results" element of Chapter 64 and filed his motion before an execution date was actually scheduled.

21

### 1. The State Conflates Chain Of Custody With Evidence Contamination.

The State does not dispute chain of custody as to the evidence held by the Attorney General's Office and the DPS Crime Lab. State Br. 55-56. It challenges chain of custody only with respect to evidence held by the Bastrop County Clerk ("BDC").

### (a) The State misrepresents witness testimony.

Reed established chain of custody for the evidence items held by the BDC through the testimony of the State's witness, Etta Wiley, the BDC Criminal Deputy Clerk. Reed Br. 86-87. Wiley testified that these items are "under lock and key" and that she has confidence that they have "not been substituted, replaced, tampered with, or materially altered." 4 R.R. 195:13-196:19. The State ignores these facts and instead responds with misdirection. It portrays the testimony of post-conviction investigator Gerald Clough as having established that the manner of "storage of these items [at the clerk's office] allowed for contamination, *were* materially altered, and *were* tampered with." State Br. 56 (emphasis added). If the State intends the foregoing language to convey that Clough stated the BDC evidence was materially altered and tampered with, it is a serious matter, because Clough did not make such statements.

Clough identified the evidence held by the BDC. 4 R.R. 179-82. The District Court sustained Reed's objections to Clough's testimony when the State

attempted to adduce opinion testimony whether he believed the manner of storage was "proper" for the "purposes of obtaining probative DNA results[.]" *See* 4 R.R. 184:5-20, 185:15-20.

The State's claim that the items "*were* materially altered, and *were* tampered with" is based upon Clough's answers to two hypothetical questions that were ***not*** addressed to the evidence held by the BDC.

> Q.    With respect to preservation of evidence that has been collected, if you had collected evidence and sealed it and put it in custody and somebody came in and opened that seal and touched it and then passed it around to other individuals, would you consider *that* evidence contaminated?
>
> Mr. MacRae [Reed's counsel]:  Your Honor, calls for speculation.
>
> The Court:  That's overruled.
>
> A.    I would.
>
> Q.    (By Mr. Ottoway)  Would you consider *that* evidence to be materially altered?
>
> ***
>
> A.    I would.

4 R.R. 185:11-186:4 (emphasis added).  These were answers to hypothetical questions.

On cross, Clough admitted that he was unaware of any substitution, replacement, tampering, or material alteration for ***any*** of the items at the BDC:

23

Q. Can you identify anything on here that has been substituted, replaced, tampered with, or materially altered?

\*\*\*

A. There is nothing that I know of.

Q. Do you have any reason to suspect that anything in here would have been materially altered, tampered with, substituted or replaced?

A. Not that I have any specific knowledge of.

4 R.R. 189:4-19. Clough thus confirmed Wiley's testimony that the BDC did ***not*** permit or know of any alteration, tampering, substitution or replacement of the evidence it holds.

Paolucci clarified that probative DNA testing can occur despite handling by ungloved jurors by comparing the DNA from such items to DNA from untouched evidence. 4 R.R. 76:17-21 ("Because if we start to put a puzzle together and we have a DNA profile from something in the box that matches something outside of the box such as those beer cans at the scene, now we're putting together a very solid case.").

Finally, as to Wiley's testimony, the State mentions her statement about certain paper evidence "touching each other," but omits any reference to her testimony that were not materially altered. 4 R.R. 196:16-197:19. The State never once addresses the fact that its witnesses established that the BDC evidence was

24

always "under lock and key" and not in fact "substituted or replaced, tampered with, or materially altered."

### (b) The State's arguments regarding chain of custody law lack merit.

Article 64.03(a)(1)(A)(ii) only requires that there be no *material* alterations to evidence. Reed's experts testified that evidence handled by ungloved jurors can provide probative DNA testing results because any resulting "alterations" do not prevent deposited DNA from being identified and compared with DNA left on "unaltered" items. *See* 2 R.R. 77:11-21-78:11-16 *and* 4 R.R. 76:17-21 (Paolucci); 3 R.R. 97:22-99:13 (Lankford). Thus, alterations resulting from such handling cannot be "material" for the purposes of Chapter 64.

The plain language of Article 64.03(a)(1)(A)(ii), in the context of the case law on chain of custody, shows the Legislature did not intend to place greater burdens on movants for DNA testing than is typical in criminal cases. Legislative history demonstrates the Legislature intended Chapter 64 requirements to "be minimal so as not to bar inmates unfairly from receiving tests…. A defendant's lawyer could establish those facts easily by requesting copies of reports from law enforcement officials." House Criminal Jurisprudence Committee, Bill Analysis, Tex. S.B. 3 at 6-7, 77th Leg., R.S. (2001).

The State's contamination arguments go "only to the weight of the evidence." *Boeck v. State*, No. 04-04-00024-CR, 2004 WL 2997788, at *2 (Tex.

25

App.—San Antonio, Dec. 29, 2004) (mem. op.) (where "there is no dispute that the samples still exist, are in a condition that makes DNA testing possible, and have been maintained post-trial under a sufficient chain of custody," court rejected State's argument that mere allegation of substitution of sample defeated chain of custody); *see also Stoker v. State*, 788 S.W.2d 1, 10 (Tex. Crim. App. 1989); *Medellin v. State*, 617 S.W.2d 229, 232 (Tex. Crim. App. [Panel Op.] 1981).  The possible deposit of additional DNA at trial on various items neither defeats Reed's proof of chain of custody nor shows that the evidence no longer contains exculpatory DNA information.  C.R. 244.  Finally, the State's cases are distinguishable; one involved items sold after a burglary which later came into State custody.  *See Pate v. State*, No. 10-09-00360-CR, 2011 WL 652920, at *1 (Tex. App.—Waco Feb. 23, 2011, pet. ref'd) (mem. op., not designated for publication).  Unlike *Pate*, the BDC evidence came straight from the crime scene and has remained there without a break in the chain of custody.  *See* 4 R.R. 195:13-196:19.  The State also cites *Riggins v. State* for a purported temperature control requirement, but that case involved feces.  *See Riggins v. State*, No. 11-03-00307-CR, 2004 WL 743742, at *1 (Tex. App.—Eastland, Apr. 18, 2004) (not designated for publication).  The Legislature has not imposed any such requirements.  *See* Tex. Code Crim. Proc. art. 64.03(a)(1)(A)(ii) (West Supp. 2014).  Reed's experts testified that the BDC's storage methods did not preclude probative DNA testing.

26

Thus, the BDC evidence has not been "substituted, tampered with, replaced, or altered in any material respect."

### 2. Reed Established Through Unrebutted Expert Testimony That The Evidence He Seeks To Test Contains Biological Evidence.

Reed's experts explained why each item contained biological evidence and how it could exculpate Reed. Reed Br. 26-35. Lankford, a forensic DNA expert, opined that, to a reasonable degree of scientific certainty, each item Reed seeks to test contains biological material suitable for DNA testing. *See* Reed Br. 24-25, 90; *see also* 3 R.R. 114, 135, 142. Paolucci, an expert in crime scene investigation, explained how the items would have been handled during the commission of the crime and that DNA evidence obtained from those items could reveal the killer's identity. Reed Br. 27-35; 2 R.R. 17-18. The State offered no rebuttal witnesses. Again, the District Court made no findings on this issue, implicitly finding that it was satisfied.

Displeased with the findings that it drafted, the State disagrees in part. The State does not dispute that "per se" biological material items, such as hair and fingerprints, contain biological material. State Br. 61.[13] The State argues that for

---

[13] Fingerprints were found on the victim's name tag. *See* Motion, Appendix, at 3; *see also* 44 Trial R.R. 41:22-25. Fingerprints were also found on the pen and check carbons. *See* Motion, App. at 1. In addition, three hairs were recovered from the victim, *id.* at 2, and another hair was gathered from the brown planner in the truck. 2 R.R. 44-45 (planner) and 50 (hair). A fingerprint was recovered from the inside passenger window of the truck. Motion, Appendix, at 1. DNA (in the form of saliva) was detected on the beer cans, and extracts were taken therefrom. 2 R.R. 46-47, 55. Using the State's proposed construct, each

"non-per se" items, Reed's experts failed to *prove* biological material exists, even though their testimony established biological material to a reasonable degree of scientific certainty. State Br. 58-59. These critical items include the belt used to strangle Stites and others handled by the perpetrator. State Br. 59 n.30.

The State argues that nothing short of results from the very DNA testing the State refused could provide *proof* sufficient to satisfy Chapter 64.01. State Br. 59 (arguing that Reed did not prove biological evidence exists because the only way to know for certain is to test it); *see also id*. at 60-61(arguing pinpoint locations of biological evidence required). Applying this test, Reed could never *prove* that the murder weapon contains DNA because the State never tested it for DNA. That is not what the legislature intended when it enacted Chapter 64 or when it amended the statute to expand the definition of material that may be tested in order to permit a convicted person to obtain evidence to demonstrate his or her innocence.

Reed explained that the degree of proof of biological material required to satisfy Chapter 64.01 is an open issue presently before the Court. *State v. Swearingen*, No. AP-77020 (submitted Jan. 21, 2015). The State ignores this and relies solely on its proposed conclusive proof standard. The State does not dispute that if this Court decides the standard is anything less, Reed has met his burden. Reed submits that under either test, his unrebutted expert evidence establishes that

---

of these items, along with the cavity swabs and tape lifts taken from the victim, constitute *per se* biological material.

28

each item he seeks to test contains biological material suitable for DNA testing to the degree required by Article 64.01.

## CONCLUSION AND PRAYER

Rarely has a more suitable case for DNA testing been presented. The District Court's Findings and Conclusions should be reversed.

Respectfully submitted,

/s/ *Bryce Benjet*
Bryce Benjet
State Bar No. 24006829
THE INNOCENCE PROJECT
40 Worth Street
New York, New York 10013
(212) 364-5340
(212) 364-5341 (fax)

Andrew F. MacRae
State Bar No. 00784510
LEVATINO/PACE LLP
1101 S. Capital of Texas Highway
Building K, Suite 125
Austin, Texas 78746
(512) 637-8565
(512) 637-1583 (fax)

*ATTORNEYS FOR RODNEY REED*

## CERTIFICATE OF SERVICE

I, Bryce Benjet, do hereby certify that a true and correct copy of the foregoing Brief was served on this 16th day of March, 2015 by first-class U.S. mail on the following:

Matthew Ottoway
Assistant Attorney General
Bastrop County, Texas
P.O. Box 12548
Capitol Station
Austin, Texas  78711

/s/ *Bryce Benjet*
Bryce Benjet

## CERTIFICATE OF COMPLIANCE WITH TEXAS
## RULE OF APPELLATE PROCEDURE 9.4(i)(3)

In accordance with Texas Rule of Appellate Procedure 9.4(i)(3), I, Bryce Benjet, hereby certify that the foregoing electronically created document has been reviewed by the word count function of the creating computer program, and has been found to be in compliance with the requisite word count requirement.

/s/ *Bryce Benjet*
Bryce Benjet