

# IN THE COURT OF CRIMINAL APPEALS OF TEXAS

### NO. WR-78,545-02

### EX PARTE DAVID MARK TEMPLE, Applicant

### ON APPLICATION FOR A WRIT OF HABEAS CORPUS
### IN CAUSE NO. 1008763-A
### FROM THE 178TH DISTRICT COURT OF HARRIS COUNTY

RICHARDSON, J., delivered the opinion of the Court in which MEYERS, JOHNSON, and ALCALA, JJ. joined. YEARY, J., filed a concurring opinion. KELLER, P.J., and KEASLER and HERVEY, JJ., dissented. NEWELL, J. did not participate.

### OPINION

Applicant, David Mark Temple, was convicted of the murder of his wife and was sentenced to life in prison. The Fourteenth Court of Appeals affirmed Applicant's conviction,[1] and this Court affirmed the judgment of the court of appeals, holding that the evidence was legally sufficient to support Applicant's conviction.[2] Applicant filed this post-conviction application for writ of habeas corpus pursuant to Texas Code of Criminal Procedure Article 11.07.[3] The trial court judge did not preside over the habeas proceedings.

---

[1] *Temple v. State*, 342 S.W.3d 572 (Tex. App.–Houston [14th Dist.] 2010).

[2] *Temple v. State*, 390 S.W.3d 341 (Tex. Crim. App. 2013).

[3] TEX. CODE CRIM. PROC. art. 11.07.

Judge Larry Gist was assigned to preside over the writ hearing. Judge Gist conducted a two-and-a-half-month writ hearing, which involved the lengthy examination of over 30 witnesses and over 200 exhibits. He prepared Findings of Fact and Conclusions of Law addressing each of Applicant's claims for relief. We agree with the habeas judge's recommendation. Relief is granted.

## A.     Background

Applicant and his wife, Belinda Temple, met in college, married, and bought a home in Katy, Texas, near Applicant's parents' house. Applicant worked as a teacher and coach at Alief Hastings High School, and Belinda worked as a teacher at Katy High School. On the afternoon of January 11, 1999, Belinda, who was seven months' pregnant, was at work when she was informed that their three-year-old son, "E.T.," was running a fever. During lunch, Belinda picked up E.T. from day care and brought him home. Around 12:30 that afternoon, Applicant arrived home to watch E.T. so that Belinda could return to work for an afternoon meeting. Between 3:30 and 3:45 p.m., Belinda arrived at Applicant's parents' house to pick up some soup. She then left for home. Applicant testified at his trial that, after Belinda arrived home, he and E.T. left so Belinda could rest. According to Applicant, he took E.T. to two different parks, then to a store to pick up some drinks and cat food. Applicant and E.T. were seen on the store video surveillance entering the store at 4:32 p.m. and leaving at 4:38 p.m. After Applicant made one more stop, he and E.T. returned home.

Applicant testified that he pulled his car into the garage, left E.T. in the garage, and went into the backyard where he noticed that the back door to the house was open and the

door's window was broken. Applicant said that he immediately grabbed E.T., took him across the street to the neighbors' house, and asked them to call 911 because the house had been broken into. Applicant and his neighbor ran back to Applicant's house. The neighbor stopped at the gate when confronted by Applicant's dog, but Applicant ran into the house. Applicant testified that he went upstairs and found Belinda's body in the closet of the master bathroom. She had been killed by a twelve-gauge shotgun blast to the back of the head. At 5:38 p.m., Applicant called 911. Officers began to arrive on scene. Thereafter, Applicant was questioned by police. He was considered a suspect from the outset, in part because it was discovered that he was having an extramarital affair; however, Applicant was not indicted until 2005. Police had also suspected a neighbor, R.J.S., who was a high-school student living with his parents next door to Applicant and Belinda. However, the police did not pursue their investigation of R.J.S.

Applicant's trial began in October of 2007. In his opening statement, Applicant's defense counsel presented a time-line to the jury that he stated would show that Applicant did not have enough time to commit the murder. The State's theory of the case was that Applicant was motivated to murder Belinda because he was having an affair with another woman. Applicant's defense counsel was aware that the State had questioned R.J.S. about Belinda's murder, but he was told by the prosecution that R.J.S. was not a suspect, and he did not receive the police reports until trial. Applicant's counsel made every attempt at that time to develop an alternate perpetrator defense. Applicant's defense counsel filed a motion

for continuance based upon the State's failure to timely disclose exculpatory evidence after the State had rested and he had begun presenting the defense's case. That motion was denied. Applicant was found guilty of murder and sentenced to life in prison.

After Applicant exhausted his direct appeals, he filed a post-conviction application for writ of habeas corpus[4] seeking relief based on (1) a claim of ineffective assistance of counsel under *Strickland v. Washington*,[5] (2) a claim that his due process rights were violated under *Brady v. Maryland*,[6] and (3) a claim of actual innocence under this Court's opinion in *Ex parte Elizondo*.[7] With regard to the claim of actual innocence, the habeas judge concluded that relief based on actual innocence is not justified.[8] After reviewing the record, we agree with the habeas judge and deny relief based upon actual innocence.[9] We will next address Applicant's claim of *Brady* violations.

## B.  Applicant's *Brady* Claim

Applicant asserts that the State wrongfully failed to disclose certain exculpatory evidence and wrongfully failed to timely disclose other exculpatory evidence. In *Brady v.*

---

[4] TEX. CODE CRIM. PROC. art. 11.07.

[5] 466 U.S. 668 (1984).

[6] 373 U.S. 83 (1963).

[7] 947 S.W.2d 202 (Tex. Crim. App. 1996).

[8] *Id. See also Ex Parte Harleston*, 431 S.W.3d 67 (Tex. Crim. App. 2014); *Ex Parte Holloway*, 413 S.W.3d 95 (Tex. Crim. App. 2013).

[9] *See Ex parte Brown*, 205 S.W.3d 538, 545 (Tex. Crim. App. 2006). *See also Ex parte Reyes*, 474 S.W.3d 677, 681 (Tex. Crim. App. 2015) (noting that, because a declaration of actual innocence might constitute "greater relief than merely granting a new trial," it is appropriate to address an actual innocence claim even though we may grant habeas relief in the form of a new trial on another ground).

*Maryland*, the Supreme Court held "that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution."[10] The Supreme Court has since held that the duty to disclose such evidence is applicable even though there has been no request by the accused,[11] and that the duty encompasses impeachment evidence as well as exculpatory evidence.[12] "Such evidence is material 'if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.'"[13] There are three essential components of a *Brady* violation: (1) the evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; (2) the evidence must have been suppressed by the State, either willfully or inadvertently; and (3) prejudice must have ensued.[14] In order to obtain relief based on a *Brady* violation, Applicant "must convince us that 'there is a reasonable probability' that the result of the trial would have been different if the suppressed [evidence] had been disclosed to the defense."[15] Favorable evidence includes exculpatory evidence and impeachment evidence. "Exculpatory evidence is that

---

[10] 373 U.S. at 87.

[11] *United States v. Agurs*, 427 U.S. 97, 107 (1976).

[12] *United States v. Bagley*, 473 U.S. 667, 676 (1985).

[13] *Strickler v. Greene*, 527 U.S. 263, 280 (1999) (quoting *Bagley*, 473 U.S. at 682).

[14] *Id.* at 281-82.

[15] *Id.* at 289 (citing *Kyles v. Whitley*, 514 U.S. 419, 434 (1995)).

which may justify, excuse, or clear the defendant from fault, and impeachment evidence is that which disputes, disparages, denies, or contradicts other evidence."[16]

Applicant claims that the State failed to timely produce favorable evidence to the defense. Most of the *Brady* evidence about which Applicant complains was contained within the several hundred pages of police offense reports that were not provided to defense counsel until some time during the trial. There was a clear discrepancy between the defense counsel's recollection of what information he received prior to trial and the prosecutor's recollection of what information she gave to defense counsel prior to trial. The prosecutor maintained that she timely gave the defense all of the *Brady* evidence they were entitled to get. The prosecutor believed, as evidenced by her testimony at the writ hearing, that she was not required to turn over favorable evidence if she did not believe it to be relevant, inconsistent, or credible. She testified that she did not have an obligation to turn over evidence that was, based on her assessment, "ridiculous." She claimed that, when it came to what constituted *Brady* evidence, her opinion is what mattered. The prosecutor stated, when asked, that if information does not amount to anything, the defense is not entitled to it. However, although the prosecutor does have the initial responsibility to assess whether evidence may be favorable to the defense, the prosecutor is not the final arbiter of what constitutes *Brady* evidence. A prosecutor who errs on the side of withholding evidence from the defense runs the risk of violating *Brady* if the reviewing court ultimately decides that it should have been

---

[16] *Ex Parte Miles*, 359 S.W.3d 647, 665 (Tex. Crim. App. 2012) (citing *Harm v. State*, 183 S.W.3d 403, 408 (Tex. Crim. App. 2006)).

turned over. The habeas judge found, and we agree, that this prosecutor's misconception regarding her duty under *Brady* was "of enormous significance."

There were at least five detectives who generated reports of their investigation of the murder, and there were approximately 1400 pages of offense reports in this case. Prior to trial, defense counsel requested copies of these reports, which he believed contained *Brady* evidence—including statements by R.J.S. and his friends, who were "rumored" to have some involvement in the murder, and evidence provided by witnesses that could have supported an alternate suspect theory. However, defense counsel was denied access to them. At the writ hearing, both the prosecutor and the defense counsel testified that there was a Harris County District Attorney's Office policy that, if a defense counsel asked for an examining trial, the prosecution would "close" its file and not give any information over to the defense.[17] And, according to defense counsel, after the prosecution's file was closed, he was told by the prosecution that the police investigations were thorough and had not resulted in any alternate suspects. Defense counsel testified, and the prosecutor confirmed, that the police reports that were given to defense counsel (some were not given at all), were not turned over until trial. Defense counsel testified that he "requested copies of all the statements very early in the

---

[17] Although the prosecutor and the defense counsel discussed by telephone on February 23, 2005 (a Wednesday), the existence of certain pieces of evidence in the prosecution's file, and defense counsel was informed that he could, at that time, come view that evidence, the prosecution's file was suddenly closed to defense counsel on that following Monday, February 28, 2005, the day defense counsel requested the examining trial.

game, and of course [he] was told [he] wasn't going to get any statements unless and until somebody testified."

In *Little v. State*,[18] this Court held that, if late-disclosed "evidence was turned over in time for the defendant to use it in his defense, the defendant's *Brady* claim would fail." But, this rule is applicable only if the defendant "received the material in time *to use it effectively at trial*."[19] Defense counsel testified at the writ hearing that, had he been given this evidence prior to trial he could have "strongly developed an alternative suspect theory and started it from the very beginning of trial." He claimed that "there's no question [he] would have tried the case differently." Defense counsel stated that "what was disclosed to [him] was disclosed in a fashion that was both untimely and confusing and late," and he "did not have enough time to utilize the information." And, although defense counsel filed a motion for continuance, that motion was denied. The habeas judge found that the State's late disclosure of favorable evidence prevented defense counsel from being able to timely investigate or effectively use such evidence at trial.

After a thorough review of the habeas record, including the findings of the habeas judge and the State's objections to such findings, we hold that the State did not properly follow the rule of *Brady* requiring the timely disclosure of favorable evidence.[20] It is true

---

[18] 991 S.W.2d 864, 866 (Tex. Crim. App. 1999).

[19] *Id.* (emphasis added).

[20] On January 1, 2014, the Legislature enacted the Michael Morton Act to ensure that defendants, such as Applicant in this case, would receive evidence that the State had in its possession in order to prepare a defense against it. *See* Michael Morton Act, 83rd Leg., R.S. ch. 49, § 3, 2013

that the prosecutor may not have purposely or actively hidden the existence of information uncovered by the police investigation;[21] however, she was not forthcoming with what could be viewed as *Brady* evidence contained within the police reports. And, although defense counsel was able to raise at trial the defensive theory that there was an alternate perpetrator, that effort was limited and hampered by the State's failure to turn over to the defense the police offense reports containing favorable evidence that would have allowed a more effective presentation of an alternate suspect.[22] We find that the method of "disclosure" utilized by the prosecution did not satisfy the State's duty under *Brady*. We hold, therefore, that Applicant is entitled to relief under *Brady v. Maryland*.

## C. Ineffective Assistance of Counsel

The habeas judge found that Applicant's ineffective assistance of counsel claim has not been shown to meet the requirements of *Strickland v. Washington*.[23] This conclusion

---

Tex. Sess. Law Serv. 1611 (codified as TEX. CODE CRIM. PROC. art. 39.14); *Ex parte Pruett*, 458 S.W.3d 537, 542 (Tex. Crim. App. 2015). The Michael Morton Act created a general, ongoing discovery duty of the State to disclose before, during, or after trial any evidence tending to negate the guilt of the defendant or reduce the punishment the defendant could receive. We believe that the Michael Morton Act was created to avoid problems exactly like those that arose in this case.

[21] The prosecutor testified that she was willing to read information to the defense prior to trial from the police reports, but they could not see them. "I would give them all the discovery they were entitled to. Piece-by-piece, day-by-day, very slowly and very miserably they got what they were entitled to have." She said she was going by "the hard rules, . . . where you go through it piece-by-piece, paragraph-by-paragraph."

[22] *See Ex Parte Villegas*, 415 S.W.3d 885 (Tex. Crim. App 2013); *Ex parte Miles*, 359 S.W.3d 647 (Tex. Crim. App. 2012) (holding that "the disclosure of all of this information to the jury could have significantly undermined the confidence in the State's case").

[23] 466 U.S. 668 (1984).

appeared to be based on the findings by the habeas judge that defense counsel received several hundred pages of offense reports to digest during trial, including portions dealing with the investigation of R.J.S. and his friends, and that much of the difficulty defense counsel faced was driven by a constant resistance of the trial prosecutor to reveal necessary information. The habeas judge opined that, while substantial information was disclosed by the prosecutor during the trial, it was "literally impossible" for defense counsel to sufficiently investigate, verify, or dispute the evidence that was disclosed. We agree with this assessment.

One of Applicant's key assertions forming the basis of his claim of ineffective assistance of counsel concerns what we agree was a critical piece of evidence—Applicant's father's (Kenneth Temple's) testimony as to the time of day that Belinda left their house for her 15 minute drive home. Had Kenneth (a defense witness) testified consistently with his prior statement (of which defense counsel had possession long before trial)—that Belinda left Applicant's parents' house at 3:55 p.m. and drove the 15 minutes to her house—this evidence would have supported the defensive theory that Applicant did not have time to commit the murder, clean up afterwards, ditch the murder weapon, and still be on a store surveillance camera with his son at 4:32 p.m. Defense counsel admitted during the habeas hearing that he made a mistake by not refreshing Kenneth's memory with Kenneth's written statement before he testified. Defense counsel testified at the writ hearing that he had no strategic reason for failing to communicate with Kenneth regarding this point, and that his failure to do so harmed Applicant. Nevertheless, even though defense counsel admitted that

he erred as to this piece of evidence, we find that the State's failure to timely disclose favorable evidence to the defense handicapped defense counsel's overall performance and caused him to lose focus of the importance of this critical piece of evidence.[24]  Therefore, to the extent that defense counsel's performance could even be viewed as being deficient, such deficiency was the direct result of the State's *Brady* violations.  We therefore decline to grant relief based on Applicant's ineffective assistance claim, particularly since there is no cause to, since we are granting relief based upon Applicant's *Brady* violation claim.[25]

**D.    Conclusion**

Relief is granted. The trial court's judgment is set aside, and Applicant is remanded to the custody of the Sheriff of Harris County to answer the charges in the indictment.  The trial court shall issue any necessary bench warrant within ten days after the issuance of this Court's mandate.

DELIVERED:              November 23, 2016

DO NOT PUBLISH

---

[24] Defense counsel testified at the writ hearing that he "was learning stuff that was vital that [he] should have known months before trial so [he] could have properly investigated it."  He said that he "did what [he] could at the time and during trial," but "[t]here was too much to digest, there was too much to investigate in the middle of trial."

[25] *See e.g.*, *Ex parte Saenz*, 491 S.W.3d 819, 833 (Tex. Crim. App. 2016); *Ex parte Allen*, Nos. AP-75580 and AP-75581, 2009 WL 282739, *9 (Tex. Crim. App. 2009) (not designated for publication) (holding that, in light of our disposition of the case granting relief on one of the applicant's grounds, we did not need to address all of the applicant's claims).